1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                        CENTRAL DISTRICT OF CALIFORNIA

10   LUZ VASQUEZ,                      )   No. ED CV 04-537-PJW
                                       )
11                  Plaintiff,         )
                                       )
12              v.                     )   MEMORANDUM OPINION AND ORDER
                                       )
13   JO ANNE B. BARNHART, Commissioner )
     of the Social Security            )
14   Administration,                   )
                                       )
15                  Defendant.         )
     ─────────────────────────────────)

16                                       I.

17                                  INTRODUCTION

18        Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and

19   1383(c)(3), seeking reversal of the decision by Defendant Social

20   Security Administration ("Agency") denying Supplemental Security

21   Income ("SSI") benefits.  Alternatively, she asks the Court to remand

22   the case to the Agency for further proceedings.  For the reasons

23   discussed below, the Agency's decision is REVERSED and the case is

24   REMANDED for further proceedings.

25

26

27

28

## II.

### BACKGROUND

Plaintiff was born on June 27, 1964, and was 38 years-old at the time of the relevant administrative hearing. (AR 25, 319, 498.) She has an eighth-grade education and past relevant work as an assembler. (AR 333, 338, 498.)

Plaintiff filed her first application for SSI on June 29, 1993; upon determining that her asthma was disabling, the Agency paid her SSI from July 1993 to April 1999. (AR 24.) After a continuing disability review, however, the Agency concluded that Plaintiff was no longer disabled and terminated her SSI effective April 30, 1999. (AR 24.) She appealed that decision but, on June 15, 2000, administrative law judge ("ALJ") Mason D. Harrell, Jr., affirmed the Agency's finding of non-disability. (AR 266-73.)

Plaintiff filed the current application for SSI benefits on November 1, 2000. (AR 319-22.) In it she alleged disability since June 23, 1993, because of asthma and a lower back impairment. (AR 24, 332.) After Plaintiff's claim was denied initially and on reconsideration, she timely requested a hearing before an ALJ. (AR 23.)

On March 18, 2003, ALJ Samuel A. Durso held an administrative hearing. Plaintiff appeared with counsel and testified. (AR 493-534.) The ALJ also heard testimony from Ms. Sandra Fioretti, a vocational expert. (AR 534.)

Plaintiff testified that she was raised in Puerto Rico, and that she reads and writes only Spanish. (AR 498.) She explained that she had been employed as an assembly worker and an order filler at various sites from March 2000 until September 2001, with each job lasting from

2

a few weeks to four months.  (*See* AR 499-509.)  Plaintiff stated that she could no longer perform this kind of work, however, because of her asthma, which caused shortness of breath and insomnia.  (*See* AR 510.)  Plaintiff testified that she used to smoke, but claimed that she had kicked her half-pack-a-day cigarette habit in early 2003.  (*See* AR 533-34.)  She added that, although she also suffered from low back pain, it did not cause her insomnia and she did not take any medication for this pain.  (AR 525.)

Additionally, Plaintiff described her recent history of treatment for symptoms of asthma, both during scheduled appointments and at emergency rooms.  (AR 510-13.)  Doctors prescribed Plaintiff Prednizone, Singulair, Advair, Proventil, and Benadryl, all of which helped alleviate her symptoms without causing side-effects.  (AR 513-18.)  Plaintiff used her inhalers approximately four times per day; she also had a nebulizer machine at home that she used to assist her when she had more severe attacks; on average, she used the nebulizer twice weekly.  (AR 518-22.)  She testified that she spent approximately three hours every day resting quietly while recovering from asthma attacks.  (AR 523-25.)  Because of her asthma, Plaintiff claimed to be unable to stand for more than an hour at a time, and incapable of lifting more than five to ten pounds.  (AR 526-27.)  Although Plaintiff admitted that her asthma would not preclude her from sedentary work, she claimed that her back pain prevented her from sitting longer than an hour at a time and precluded her from bending at the waist.  She added, however, that she had no difficulty kneeling or squatting.  (AR 526-28.)

Plaintiff also described her daily activities.  (AR 528-34.)  On a typical day, Plaintiff would get up in the morning, lay out clothing

3

for her three children, cook them breakfast, drive them to school, and return home to make the beds, wash dishes, launder a few loads of clothes, watch television for two or three hours, help her children with their homework when they came home from school, and begin preparing dinner.  (AR 528-32.)  She also would spend an hour every other day at the grocery store, although sometimes her daughter or a neighbor would accompany her to load the groceries into the cart and the car.  (AR 532.)  Plaintiff stated that she visited a neighbor daily or every other day for up to an hour at a time.  (AR 533.)

Vocational Expert Sandra Fioretti also testified.  (*See* AR 534-52.)  She stated that Plaintiff's four-month-long job as a cable box assembler would be classified as "laborer storage" under the Dictionary of Occupational Titles ("DOT"), an unskilled position performed at the light- to medium-level of exertion.  (AR 534-35.) The ALJ then asked her whether a woman of Plaintiff's age, education, and language capabilities would be capable of returning to that job if she was limited to light work and "need[ed] to avoid concentrated exposure to extreme cold or extreme heat, as well as fumes, odors, dust, poor ventilation and gases."  (AR 535-36.)  She testified that a person with these limitations could not perform Plaintiff's former employment.  (AR 536.)  She added, however, that a person with these limitations could perform other jobs--including those of fast food worker, assembler of hospital products, and cashier--all of which existed in significant numbers in the local economy.[1]  (AR 536.)  The

---

[1]  The vocational expert made clear that her estimate of the number of fast food jobs available assumed that Plaintiff's need to avoid exposure to fumes and smoke would confine her to the front counter, and excluded cooking positions within the fast-food category. (AR 541-42.)

vocational expert also added that, even if this hypothetical person were limited to sedentary work, a significant number of sedentary assembly jobs existed locally.  (AR 536-37.)  She acknowledged, however, that if Plaintiff's claimed sit/stand limitations were credited, the number of sedentary assembly jobs available would be eroded by 75%.  (AR 543-44.)  She also stated that, if Plaintiff's claimed nebulizer usage and her recent frequent absences from work to obtain medical care were fully credited and extrapolated into the future, these additional limitations would "eliminate 90 percent, if not all, jobs."  (AR 551-52.)  She also opined that if Plaintiff's account of her limitations were found fully credible, then she could not perform other work.  (AR 537-38.)

On April 24, 2003, the ALJ issued a decision analyzing Plaintiff's claims under the Agency's five-step sequential evaluation process.  (AR 23-23.)  At the outset, the ALJ noted that, insofar as Plaintiff's alleged onset date of June 23, 1993 already had been adjudicated in ALJ Harrell's decision denying benefits, that prior decision was *res judicata* and would not be reopened.  (AR 24-25.)  Accordingly, the ALJ only assessed Plaintiff's claim of disability as of June 16, 2000--the day *after* the date of ALJ Harrell's decision--forward.[2]  (*See* AR 25.)

At step one, the ALJ found that Plaintiff had "not engaged in substantial gainful activity since June 16, 2000."  (AR 31.)  At step two, the ALJ found that Plaintiff's impairments--including asthma and a back impairment--were, taken in combination, "severe" within the

---

[2]  As the Agency points out, Plaintiff has not challenged the ALJ's refusal to revisit the Agency's determination that she was not disabled before June 16, 2000.  (*See* Cross-Motion at 3 n.1.)

meaning of the regulations.  (*See* AR 25.)  At step three, however, the ALJ found that these impairments did not meet or equal a listing. (*See* AR 28.)  The ALJ then determined that Plaintiff retained the residual functional capacity to perform "at least a sedentary level of work activity."[3]  (*See* AR 28.)  The ALJ offered ten separate reasons for rejecting as "not credible" Plaintiff's subjective complaints and her claims relating to her limitations.  (AR 29.)  In light of the vocational expert's testimony, the ALJ found Plaintiff unable to resume any of her past relevant work.  (AR 29.)  At step five, however, he determined that Plaintiff's residual functional capacity left her fit for other jobs--specifically, sedentary assembly work-- and noted that 12,000 such jobs existed in the local economy.  (AR 30.)  Accordingly, the ALJ concluded that Plaintiff was not disabled as defined in the Social Security Act (the "Act") at any time through the date of the decision.  (AR 30.)

Plaintiff timely requested review of the ALJ's decision.  (AR 19.)  On April 5, 2004, however, the Appeals Council denied review, and the decision of the ALJ became the final decision of the Agency. (AR 8-10.)

III.

STANDARD OF REVIEW

"Disability" under the applicable statute is defined as the inability to perform any substantial gainful activity because of "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

---

[3]  Because Plaintiff raises a specific challenge to the ALJ's determination of her residual functional capacity, (*see* Motion at 6), the particulars of that assessment are set below.

last for a continuous period of not less than twelve months."  42
U.S.C. § 1382c(a)(3)(A).  The Court may overturn the ALJ's decision
that a claimant is not disabled only if the decision is not supported
by substantial evidence or is based on legal error.  *See Magallanes v.
Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

Substantial evidence "'means such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion.'"
*Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison
Co. v. NLRB*, 305 U.S. 197, 229 (1938).)  It is "more than a mere
scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d
599, 601 (9th Cir. 1998), and "does not mean a large or considerable
amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

"The Court must uphold the ALJ's conclusion even if the evidence
in the record is susceptible to more than one rational
interpretation."  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595,
599 (9th Cir. 1999).  Indeed, if the record evidence can reasonably
support either affirming or reversing the Agency's decision, this
Court must not substitute its judgment for that of the ALJ.  *See
Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  If the ALJ
committed error but the error was harmless, reversal is not required.
*See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th
Cir. 2003)(applying the harmless error standard).

IV.

DISCUSSION

Plaintiff claims that the ALJ erred by (1) finding that her
asthma was not sufficiently severe to meet or equal Listing 3.03B at
step three of the sequential process; by (2) failing to offer proper
reasons for finding Plaintiff's subjective symptom complaints to be

not credible; and by (3) determining that she retained the residual functional capacity to perform sedentary assembly work at step five of the sequential process.[4] (*See* Motion at 4-10.)

Each of Plaintiff's arguments will be addressed in the order stated. For the reasons set forth below, the Court determines that the matter must be reversed and remanded for further proceedings.

A.   The ALJ's Conclusion That Plaintiff's Asthma Did Not Meet Or Equal Listing 3.03B

Under listing 3.03B, asthmatics are deemed disabled if their pulmonary impairment is sufficiently severe and persistent. The pertinent regulation provides that an applicant is disabled if she suffers from asthma with:

> Attacks [. . .] occurring in spite of treatment and requiring physician intervention, occurring once every two months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least twelve consecutive months must be used to determine the frequency of attacks.

*See* 20 C.F.R. § 404, Subpart P, App. 1, Section 3.03B.

For purposes of Listing 3.03B, "attacks" are defined as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic

_____

[4] Although Plaintiff briefs these second and third arguments as though they were part of an overarching challenge to the ALJ's assessment of her residual functional capacity, (*see* Motion at 6-10), the Court will address them separately in this Order because they are, in fact, analytically-distinct claims implicating steps three, four, and five of the sequential process.

1  administration or prolonged inhalation bronchodilator therapy in a

2  hospital, emergency room, or equivalent setting." *See* 20 C.F.R.

3  § 404, Subpart P, App. 1, Section 3.00C.  If a claimant's condition

4  satisfies all of the elements of Listing 3.03B, the analysis ends at

5  step three, and she is considered "disabled" for purposes of the Act.

6  *See Bowen v. City of New York*, 476 U.S. 467, 471 (1986).

7      In Plaintiff's case, the ALJ determined that she no longer met

8  the requirements of Listing 3.03B, reasoning:

9          In order for [Plaintiff] to be considered disabled under

10          this listing, she must show emergency room visits averaging

11          at least six times per year.  This requirement is far from

12          met.  [Plaintiff] had only one visit to the emergency room

13          in 2000, three emergency room visits in 2001, two visits to

14          the emergency room in 2002, and only two visits so far to

15          the emergency room in 2003.  [Plaintiff] also had two

16          medical office visits, one on January 16, 2003 and the other

17          on January 20, 2003.  However, these were not emergency room

18          visits, but rather office visits.  The listing requires

19          emergency room visits or inpatient visits, which count as

20          two.  However, the last inpatient hospital stay for asthma

21          was in 1994.  So [Plaintiff] is only averaging emergency

22          room visits two times per year.

23  (AR 28.)

24      Plaintiff faults the ALJ for omitting to count her emergency room

25  visit of December 1, 2001.  (*See* Motion at 5.)  Although the record

26  reflects that Plaintiff visited the emergency room and was discharged

27  approximately four hours after receiving treatment for an asthma

28  attack, (*see* AR at 411), the regulations assess the severity of a

9

1  claimant's asthma by examining her course of treatment over 12
2  *consecutive* months.  *See* Section 3.03B.  The ALJ properly disregarded
3  the December 1, 2001 emergency-room visit because it fell outside the
4  period from February 11, 2002 to February 11, 2003: the 12-month span
5  in which Plaintiff logged the most hospital and emergency-room visits
6  for asthma attacks.

7       Plaintiff also argues that, during two of her hospital visits--on
8  January 16, 2003, and two weeks later, on January 30, 2003--she
9  required treatment for asthma "exacerbations."  (*See* Motion at 5.)
10 Had the ALJ counted these two visits as "equivalent" to emergency room
11 visits or hospitalizations, Plaintiff argues that she would have
12 suffered exactly six "attacks" within a 12-month period, as Listing
13 3.03B requires.  (*See* Motion at 5.)  The Agency counters that the
14 medical records for these two dates do not document "attacks" within
15 the meaning of Listing 3.00C, but merely reflect Plaintiff's return
16 for follow-up office visits.  (*See* Cross-Motion at 5.)

17      The Court concludes that the Agency has the better of the two
18 arguments on this issue.  As the Agency points out, Plaintiff's
19 treatment records for January 2003 show that these two visits were,
20 indeed, regularly-scheduled follow-up office visits.  (*See* AR 463,
21 465.)  Plaintiff admitted as much at the hearing.  (*See* AR 512-13.)
22 Courts have declined to count routine office visits as "attacks" for
23 purposes of these Listings.  *See Lintz for Robinson v. Shalala*, No. C-
24 94-2920-VRW, 1996 WL 24764, at *3 (N.D. Cal. Jan. 16, 1996)(refusing
25 to count a claimant's "routine" office visit as an asthma attack); *see
26 also Bomeisl v. Apfel*, No. 96 CIV 9718(MBM), 1998 WL 430547, at *5
27 (S.D.N.Y. July 30, 1998)(holding that, although the record showed that
28 the claimant visited the hospital several times in a 12-month period

for treatment for his asthma, his condition did not meet or equal
Listing 3.03B where "these visits were brief and there is no evidence
that any was prompted by an 'attack' as that concept is defined by the
regulations" and where "most of [his] hospital visits were for the
purpose of renewing prescriptions for his asthma medication").

Additionally, a review of the medical records for those dates
provides no support for Plaintiff's contention that she required
"steroid and medical nebulizer treatments for asthma exacerbations"
during those visits. (*See* Motion at 5.)  Instead, on both occasions
Plaintiff's doctor told her to continue taking her regularly-
prescribed medications; during the January 30th visit, Plaintiff also
was advised to resume taking Prednisone, which her doctor previously
had discontinued. (*See* AR 464, 466.)  Thus, although the ALJ
erroneously believed that Listing 3.03B required proof of emergency
room visits to establish an "attack," this error was harmless because
--however characterized--Plaintiff's previously-scheduled visits of
January 16 and 30, 2003 did not meet the criteria of Section 3.00C.
*See Batson*, 359 F.3d at 1197.[5]

Plaintiff suggests, however, that "the ALJ should not be allowed
to disregard [her] use of a breathing nebulizer machine at home."
(*See* Motion at 9.)  On this score, Plaintiff maintains:

> Most certainly, if the Plaintiff did not have the nebulizer
> machine at home, she would be going to the emergency room on
> a much more frequent basis than is reported in the

---

[5]  Although the ALJ's mistaken belief that an asthma "attack"
must be evidenced by an emergency-room visit was harmless error, other
errors in the decision require remand for further proceedings, as will
be explained below.  Accordingly, the ALJ will have the opportunity to
correct this error in a third decision.

11

1   Administrative Record.  Only by using this breathing
2   nebulizer machine on a regular and frequent basis, is the
3   Plaintiff capable of staying out of the emergency room.
4   (*See* Motion at 9.)
5   Certainly, a claimant's home nebulizer usage may diminish her
6   need for emergency room visits or hospitalization.  Although claimant
7   cites no authority for the proposition, some courts have held that
8   asthmatic episodes treatable with a home nebulizer may be considered
9   the equivalent of "attacks" within the meaning of Listing 3.00C.  *See*
10  *Riley v. Barnhart*, No. Civ.A. 03-0288, 2004 WL 2423840, at *6-7 (E.D.
11  La. Oct. 28, 2004)(remanding to permit the ALJ to determine whether a
12  claimant's use of a home nebulizer would satisfy Listings 3.00C and
13  3.03B); *Pogozelski v. Barnhart*, No. 03 CV 2914(JG), 2004 WL 1146059,
14  at *19 (E.D.N.Y. May 19, 2004)(remanding with orders to reassess an
15  asthmatic claimant's residual functional capacity where the ALJ had
16  ignored her daily use of a nebulizer and failed to consider that such
17  usage "might have obviated any need for hospitalization").  Most
18  courts, however, have declined to count a claimant's home nebulizer
19  usage as though it were the "attack" it forestalled.  *See*, *e.g.*, *Auer
20  v. Secretary of Health & Human Servs.*, 830 F.2d 594, 595 (6th Cir.
21  1987)(holding that the ALJ's finding of non-disabling asthma condition
22  was supported by substantial evidence where the claimant used a
23  "nebulizer which alleviated his need to receive these treatments at a
24  hospital"); *see also Goodenow-Boatsman v. Apfel*, No. C-99-4776 VRW,
25  2001 WL 253200, at *3 (N.D. Cal. Feb. 27, 2001)(affirming the ALJ's
26  finding of non-disability where the claimant "went to an emergency
27  room only several times over two years preceding the hearing when the
28  home nebulizer could not adequately suppress asthma attacks");

1  *Anderson on behalf of Anderson v. Shalala*, No. CV-93-4753, 1994 WL

2  722810, at *2 (E.D.N.Y. June 20, 1994)(affirming the ALJ's finding of

3  non-disability where the claimant's use of a home nebulizer obviated

4  the need to visit a hospital or emergency room for acute attacks).

5  This Court agrees with the latter line of authorities, and declines

6  Plaintiff's invitation to count her home nebulizer usage toward the

7  requisite six "attacks" within a 12-month span.   Any other result

8  would contravene the spirit of the regulations, which focus on attacks

9  "occurring in spite of treatment *and requiring physician*

10 *intervention*."   *See* Listing 3.03B (emphasis added).

11     In sum, Plaintiff has not demonstrated that her asthma met or

12 equaled Listing 3.03B.   That being so, the ALJ properly proceeded to

13 steps four and five of the sequential evaluation.   *See Sullivan v.*

14 *Zebley*, 493 U.S. 521, 530 (1990)("For a claimant to show that his

15 impairment matches a listing it must meet *all* of the specified medical

16 criteria.   An impairment that manifests only some of those criteria,

17 no matter how severely, does not qualify.")(emphasis in original).

18 B.   The ALJ's Adverse Credibility Determination

19     Plaintiff next argues that the ALJ erred in evaluating her

20 credibility and subjective symptom complaints.   (*See* Motion at 6-9.)

21 The Court concludes that the ALJ's assessment of Plaintiff's

22 credibility was defective in that it contained no specific finding

23 regarding the credibility of Plaintiff's claimed need for bi-weekly

24 home nebulizer treatments.   Additionally, the reasons that the ALJ did

25 offer for his adverse credibility finding were inadequate because they

26 were not linked to any of Plaintiff's claimed limitations or symptoms.

27 These errors must be corrected on remand.

28

1    "Credibility determinations are the province of the ALJ." *Fair*

2  *v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  An ALJ may reject a

3  claimant's testimony as not credible by *specifically* identifying the

4  incredible testimony and by identifying the evidence that undermines

5  that testimony.  *See Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.

6  1996)(emphasis added).  As long as substantial evidence in the record

7  supports the ALJ's credibility finding, this Court may not

8  second-guess it.  *See Morgan*, 169 F.3d at 600.  Nor will the Court

9  reverse an ALJ's credibility determination based on contradictory or

10 ambiguous evidence.  *See Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.

11 1984).

12    The Ninth Circuit recognizes that pain testimony is difficult to

13 weigh because "pain is a highly idiosyncratic phenomenon, varying

14 according to the pain threshold and stamina of the individual victim."

15 *Howard v. Heckler*, 782 F.2d 1484, 1488 (9th Cir. 1986).  More

16 expansively, the circuit has observed:

17        Unlike most medical conditions capable of supporting a

18        finding of disability, pain cannot be objectively verified

19        or measured . . . .  [T]he very existence of pain is a

20        completely subjective phenomenon.  So is the degree of pain:

21        The amount of pain caused by a given physical impairment can

22        vary greatly from individual to individual.

23 *Fair*, 885 F.2d at 601.

24    The inherent difficulty in evaluating another person's experience

25 of subjective symptoms has prompted the Ninth Circuit to require the

26 ALJ to undertake a two-step analysis when considering a claimant's

27 symptom testimony.  First, the ALJ must examine the evidence to

28 determine whether the claimant has met her burden of producing

14

1  objective medical evidence of an impairment, *and* of showing that the

2  impairment reasonably could be expected to produce a symptom.  *See*

3  *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996).

4      In Plaintiff's case, the ALJ did not acknowledge that Plaintiff's

5  impairments could cause the symptoms she alleged.  Instead, the ALJ

6  explained that "the objective evidence of [Plaintiff's] medical record

7  does not establish impairments likely to produce disabling pain or

8  other limitations as alleged [. . .]."  (AR 29.)  Although it is

9  tempting to interpret this as a finding that Plaintiff's subjective

10  symptom complaints did *not* satisfy the first *Smolen* step, such a

11  construction cannot be reconciled with the fact that this particular

12  finding was offered as the tenth of ten substantive reasons why the

13  ALJ believed that Plaintiff's testimony was not credible.  (*See* AR 28-

14  29.)  Thus, the only way to reconcile the ALJ's credibility findings

15  with *Smolen* is to conclude that he skipped the first *Smolen* step

16  entirely and jumped directly to the second step: which required the

17  ALJ to assess Plaintiff's credibility as to the severity of her

18  subjective symptoms.  *See Smolen*, 80 F.3d at 1282.

19      At the second *Smolen* step, the claimant must produce medical

20  evidence of an underlying impairment reasonably likely to be the *cause*

21  of her alleged symptoms, although she is not required to submit

22  medical findings to substantiate the *severity* of those symptoms.  *See*

23  *Drouin v. Sullivan*, 966 F.2d 1255, 1258 (9th Cir. 1992).  Thus, the

24  ALJ may not reject the claimant's subjective complaints regarding the

25  extent and severity of her symptoms merely because they cannot be

26  supported by objective medical evidence.  *See Bunnell v. Sullivan*, 947

27  F.2d 341, 343 (9th Cir. 1991)(*en banc*)(citation omitted).  Rather, a

28  claimant's testimony concerning the severity of her symptoms can only

15

1   be rejected for specific, clear, and convincing reasons.  *See Drouin*,

2   966 F.2d at 1258; *see also Lester*, 81 F.3d at 834 ("For the ALJ to

3   reject the claimant's complaints, [the ALJ] must provide specific,

4   cogent reasons for the disbelief.")(internal quotation marks and

5   citation omitted).

6       In Plaintiff's case, the ALJ enumerated ten distinct reasons for

7   finding her subjective symptom complaints to be not credible to the

8   extent alleged.  (*See* AR 28-29.)  Although the Court will address the

9   credibility findings that the ALJ *did* make below, what is most

10  conspicuous is the credibility finding that the ALJ did *not* make:

11  specifically, nowhere among the ALJ's ten reasons is there any finding

12  that Plaintiff's claimed need for bi-weekly home nebulizer treatments

13  was anything other than fully credible.  (*See* AR 28-29.)  This

14  omission alone requires remand.

15      Courts have recognized that a claimant's need for home nebulizer

16  treatments may limit her ability to perform other jobs in the national

17  economy.  *Cf. Mullins v. Barnhart*, No. Civ.A 2:04CV00082, 2005 WL

18  1606459, at *12 (W.D. Va. July 8, 2005)(noting that the expert

19  testified the claimant's home nebulizer usage would render her

20  unemployable); *with Carroll v. Barnhart*, 291 F.Supp.2d 783, 796 (N.D.

21  Ill. 2003)(noting vocational expert testimony to the effect that a

22  claimant's home nebulizer usage would *not* affect her ability to

23  perform other work).  In Plaintiff's case, it is unclear how much, if

24  at all, her use of a home nebulizer machine would affect her ability

25  to perform other work.  The vocational expert did testify, in response

26  to the ALJ's very broad hypothetical question, that--if all of

27  Plaintiff's subjective complaints were found credible--she would be

28  disabled.  (*See* AR 537-38.)  To curtail what he viewed as redundant

16

1    questioning by counsel, the ALJ voiced his assumption that this

2    sweeping hypothetical covered Plaintiff's use of a nebulizer as well

3    as *all* of her other claimed limitations, and the vocational expert did

4    not contradict him.[6]  (*See* AR 544-46.)

5         Where, as here, there is evidence that an asthmatic claimant's

6    nebulizer usage may impact her ability to perform other work, the ALJ

7    must offer *specific* reasons if he considers this particular limitation

8    not to be credible.  *See Hogue v. Barnhart*, No. 03-Civ.-4963(SHS),

9    2005 WL 1036336, at *19 (S.D.N.Y. May 3, 2005)(finding ALJ's

10   credibility discussion inadequate where it failed to explain whether

11   the ALJ rejected an asthmatic claimant's testimony "regarding the need

12   for daily nebulizer treatments").  If an ALJ fails to explain whether

13   he finds a claimant's nebulizer usage to be credible, reversal is

14   necessary.  *See Hogue*, No. 03-Civ.-4963(SHS), at *19; *see also Smith*

15   *v. Barnhart*, No. 04-2197-GTV, 2005 WL 589758, at *9 (E.D. Pa. Mar. 11,

16   2005)(reversing where the ALJ "merely stated that she found [an

17   asthmatic plaintiff's] claims partially credible, without discerning

18   what was credible, what was not, and why," and holding that "on

19   remand, the ALJ should offer reasons why she finds that [p]laintiff

20   does not need to use a nebulizer breathing machine on a regular

21   basis"); *Wilson v. Commissioner of Social Sec. Admin.*, No. 03 C 3662,

22   2004 WL 1687086, at *4 (N.D. Ill. July 23, 2004)(noting that, on

23   remand, the claimant's professed need for multiple daily nebulizer

24

25        [6]  The sloppiness of the hypothetical questions posed at the
     hearing and the chaotic nature of counsel's questioning of the
26   vocational expert hopelessly obscured the expert's ultimate conclusion
     on the impact that Plaintiff's nebulizer usage would have on her
27   employability.  (*See* AR 538-51.)  As explained below, this defect must
     be rectified at another hearing with the testimony of a vocational
28   expert.

treatments "must be either included in the hypothetical questions or
the ALJ must provide a more sufficient explanation for her finding
that they are incredible claims").

As the above-cited authorities reflect, this omission alone is
serious enough to warrant remand to permit the ALJ to reassess
Plaintiff's credibility.  A review of the ten reasons that the ALJ *did*
offer reveals, however, that each is compromised by a common fatal
defect: all are general, and none is tied to any particular claimed
limitation or symptom.  In regards to credibility, "[g]eneral findings
are insufficient; rather, the ALJ must identify what testimony is not
credible and what evidence undermines the claimant's complaints."
*Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)(citations
omitted).  In light of the teaching of *Reddick*, the Court addresses
several of the ALJ's reasons for discounting Plaintiff's credibility.

First, the ALJ's reliance on the fact that Plaintiff continued to
smoke in finding her testimony to be incredible is not adequately
explained.[7]  (*See* AR 29 (reason Two).)  A claimant's smoking habit
could provide a legitimate reason for discounting the credibility of
her subjective symptom testimony.  *See Goodenow-Boatsman*, 2001 WL
253200, at *4 (noting that "Plaintiff's smoking habit in this case
serves as relevant evidence in discrediting [her] testimony by
illustrating inconsistencies between [her] own conduct and the

_____

[7]  Also in the context of Plaintiff's cigarette smoking, the ALJ
noted that her credibility was undermined by the fact that she told
the examining physician that she kept a small pet at home. (*See* AR
29.)  What Plaintiff actually said was that she had a dog at home, but
that she kept it outside to avoid an asthmatic reaction to it. (AR
392.)  The fact that Plaintiff's family kept a pet outdoors has little
bearing on her credibility, particularly in light of her testimony
that she spends most of her time *inside* her house. (*See* AR 528-34.)

18

severity of asthma as claimed by [P]laintiff"). Other federal courts have concurred. *See*, *e.g.*, *Clemons v. Barnhart*, No. 03 C 4200, 2004 WL 2658077, at *5 (N.D. Ill. Oct. 14, 2004)(upholding an ALJ's adverse credibility determination where "[t]he claimant has asthma but medical records and testimony show she continues to smoke"); *Mooney v. Shalala*, 889 F.Supp. 27, 32 (D.N.H. 1994)(upholding the ALJ's reference to an asthmatic claimant's cigarette smoking in finding that subjective symptom testimony was not credible, stating: that "[t]his type of relevant contradiction in [his] testimony, as to what he can and cannot do, provided ample evidence for the ALJ to determine that [his] subjective complaints, including pain, were not entirely credible."). Plaintiff does not contest that she smoked, (*see* Motion at 8), and the record confirms that she did.[8]  Rather, the problem is that the ALJ articulated no clear connection between Plaintiff's tobacco addiction and her credibility. Usually, the analytical basis for discounting a smoker's credibility lies in her non-compliance with a prescribed course of treatment--*i.e.*, her unwillingness to quit smoking *as her doctor has ordered*. *See Saephan v. Barnhart*, No. C-02-2374 MMC, 2004 WL 329332, at *5 (N.D. Cal. Feb. 18, 2004)(approving the ALJ's adverse credibility determination based in part on the

---

[8]  The record confirms that Plaintiff was a smoker at least as early as August 2000. (*See* AR 442). On February 25, 2001, Plaintiff told Dr. Robert Yang, the examining physician, that she was an occasional smoker and that she kept a small dog outdoors at home. (*See* AR 392.) In October 2001, Plaintiff was prescribed Nicoderm for her tobacco addiction (*see* AR 443); during an emergency-room visit three weeks later, Plaintiff told Dr. Jonathan Lee that she had quit smoking. (AR 422.) By February 2003, however, the medical records reflect that Plaintiff had resumed smoking. (*See* AR 467.) At the hearing in March 2003, Plaintiff told the ALJ that she again quit smoking in January or February 2003. (AR 533-34.)

claimant's "failure to stop smoking *as directed by his treating physician*")(emphasis added); *see also Goodenow-Boatsman*, 2001 WL 253200, at *3 (upholding an ALJ's adverse credibility determination against an asthmatic claimant who smoked where, "[d]espite repeated recommendations by doctors, plaintiff never stopped smoking"); *Leach v. Apfel*, No. C-96-4099-CAL, 1998 WL 246704, at *3 (N.D. Cal. May 6, 1998)(refusing to disturb an ALJ's finding that a claimant's refusal to quit smoking made his subjective symptom testimony less credible where "the ALJ chose to believe the medical records indicating that the doctors considered quitting smoking a way for [the claimant] to treat his condition"); *Higgins v. Callahan*, 983 F. Supp. 865, 871 (E.D. Mo. 1997)(holding that a claimant's "failure to stop smoking, when some of his impairments are related to his smoking habit, *as his physicians recommended*, militates against a finding of disability")(emphasis added).  Here, however, the ALJ has not pointed to any evidence that any of Plaintiff's doctors ever recommended that she quit smoking.  Conceivably, Plaintiff's smoking also could be relevant to her credibility insofar as it casts doubt on her asserted sensitivity to--and need to work in an environment free of--airborne irritants.  *See Mullins*, 2005 WL 1606459, at *13; *see also Goodenow-Boatsman*, 2001 WL 253200, at *3; *Mooney*, 889 F.Supp. at 32.  But the ALJ did not draw this connection, either.  When reassessing Plaintiff's credibility on remand, the ALJ must explain which of Plaintiff's testimony regarding her limitations, subjective complaints, or compliance with treatment is undermined by the fact that she is, or was, a smoker.

     Three of the other reasons the ALJ offered are tangentially grounded in his determination that Plaintiff received conservative

1   treatment for her symptoms and "responded well to bronchodilators."

2   (*see* AR 29 (reasons Three, Seven, and Nine).)   A claimant's pursuit of

3   only conservative treatment for her symptoms, without offering any

4   explanation for failing to seek more aggressive treatment, can be

5   considered when evaluating her credibility.   *See Johnson v. Shalala*,

6   60 F.3d 1428, 1434 (9th Cir. 1995); *see also Meanel v. Apfel*, 172 F.3d

7   1111, 1114 (9th Cir. 1999).   Here, however, the record raises some

8   question as to whether the treatment Plaintiff received for her

9   asthma--conservative or otherwise--was effective in controlling her

10  symptoms. (*See*, *e.g.*, AR 422 (noting that Plaintiff's Albuterol "has

11  not helped"); AR 464, 466 (noting that Plaintiff's asthma was "poorly

12  controlled" with medication).)   The ALJ did not reconcile his belief

13  that Plaintiff's asthma was controllable with bronchodilators with

14  this conflicting evidence.   Where "none of the many physicians [a

15  claimant] has seen has suggested *effective* treatment [. . . ], the

16  amount of medical treatment [the claimant] has received is not

17  necessarily inconsistent with his complaints."[9]   *See Regennitter v.*

18  *Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1296 (9th Cir. 1999)

19

20      [9]   At any rate, and as Plaintiff points out, the ALJ appears to
21  have bootstrapped his third and ninth reasons into his step-three
    finding that her asthma was not severe enough to meet or equal a
22  Listing. (*See* Motion at 8-9.)   The same can be said of the ALJ's
    sixth reason, which implies that Plaintiff's testimony is not credible
23  because the results of a pulmonary function study did not meet or
    equal Listing 3.02A. (*See* AR 29.)   But a finding that a claimant's
24  impairment falls short of a Listing is neither dispositive of, nor
    particularly relevant to, the question whether her limitations are,
25  nevertheless, sufficiently serious--and her subjective symptom
    complaints, sufficiently credible--to support the conclusion that she
26  is disabled at step five.   For that reason, the ALJ should eliminate
    or explain these three justifications for finding Plaintiff's
27  subjective symptom testimony not credible, if he re-adopts them in his
28  credibility findings on remand.

1  (emphasis added).  If the ALJ wishes to reiterate this particular

2  reason in his post-remand credibility finding, he must explain what

3  evidence he is relying upon in assuming that Plaintiff's treatment has

4  been conservative; if the ALJ concludes that Plaintiff's asthma is

5  controlled with conservative treatment, he must reconcile that

6  conclusion with the evidence that her asthma is poorly controlled.

7        The ALJ's adverse credibility finding also rested, at least in

8  part, on the fact that Plaintiff did not display symptoms during some

9  of her examinations.  (*See* AR 29 (reasons Four and Five).)  Although

10  the record supports the ALJ's conclusion that Plaintiff was

11  asymptomatic on February 25, 2001, the day she was examined by Dr.

12  Yang, (*see* AR 393), this evidence is of little value, especially

13  considering the highly sporadic nature of the symptoms that asthmatics

14  experience.  Moreover, Dr. Yang's observations about Plaintiff's

15  asthma are not representative of the record as a whole, which

16  documents numerous instances when Plaintiff sought medical attention

17  for serious symptoms and attacks.  (*See* AR 458-86.)  Where, as here,

18  the ALJ's credibility finding rests upon selective, unrepresentative

19  citations to the record, the finding cannot stand.  *See Holohan v.*

20  *Massanari*, 246 F.3d 1195, 1203-05 (9th Cir. 2001)(reversing an adverse

21  credibility finding and remanding for an award of benefits where the

22  ALJ selectively quoted a doctor's records out of context).

23        Finally, the ALJ discounted Plaintiff's credibility because of

24  the fact that she continued to perform household chores, (*see* AR 29

25  (reason One)), a fact that Plaintiff admitted at the hearing.  (*See*

26  528-34.)  In the abstract, the ALJ's consideration of this activity

27  was not improper.  *See Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir.

28  1995)(noting that "[a]n ALJ is clearly allowed to consider the ability

22

1   to perform household chores" when assessing a claimant's degree of

2   limitation); *see also Fair*, 885 F.2d at 602 (explaining how a

3   claimant's performance of household chores could impact her

4   credibility).  As the Agency concedes, however, Plaintiff's daily

5   activities "would not be dispositive of her ability to work." (*See*

6   Cross-Motion at 6.)  The Court agrees.  A claimant's ability to

7   perform household activities only bears on her credibility to the

8   extent that her level of activity is in fact inconsistent with the

9   claimed limitations.  *See Reddick*, 157 F.3d at 722.  Here, although

10   the record may or may not contain evidence that Plaintiff "is able to

11   spend a substantial part of [her] day performing household chores or

12   other activities that are transferable to a work setting" or that the

13   level of her activity is in fact inconsistent with her claimed

14   limitations, *see Smolen*, 80 F.3d at 1284 n.7, the ALJ did not so find,

15   let alone point to any evidence in the record that would support the

16   inference.

17       The ALJ also cited the fact that the objective medical evidence

18   showed only a "moderate obstructive lung defect." (*See* AR 29 (reason

19   Seven).)  Again, at the second *Smolen* step, the ALJ may not find a

20   claimant's subjective complaints incredible because of lack of medical

21   findings to substantiate the *severity* of her symptoms.  *See Drouin*,

22   966 F.2d at 1258.  Additionally, the ALJ stated that he was finding

23   Plaintiff's testimony incredible in part because her *doctor's*

24   conclusion that she as unable to work was unsupported by clinical

25   findings.  (*See* AR 29 (reason Eight).)  Although the lack of objective

26   findings was a reason to discount the opinion of Plaintiff's doctor

27   (which the ALJ also did, *see* AR 27-28), it was not a legitimate reason

28   to determine that Plaintiff's *own* testimony was not credible.

1    If the ALJ wishes to reiterate this reason for discounting

2 Plaintiff's credibility in his post-remand decision, he must point to

3 substantial evidence in the record that Plaintiff is more active than

4 her claimed limitations would permit, or that the type and level of

5 her activity is transferrable to a work setting.

6    In sum, reversal and remand is necessary to permit the ALJ to

7 reassess Plaintiff's credibility.  On remand, the ALJ must

8 specifically explain whether he finds Plaintiff's claimed need to use

9 a home nebulizer to be credible, a finding he failed to make in the

10 last decision.  Additionally, the ALJ must revisit the credibility

11 findings that he did make, specifically identifying any of Plaintiff's

12 claimed limitations or symptoms that he finds to be incredible and

13 stating with particularity why he disbelieves them.  *See Reddick*, 157

14 F.3d at 722.

15 C.   The ALJ's Determination That Plaintiff Retained The Residual

16    Functional Capacity To Perform Other Jobs

17    Finally, Plaintiff contends that the ALJ erred in reaching the

18 step-five conclusion that she retained the residual functional

19 capacity to perform other jobs in the local economy.  (*See* AR 6, 10.)

20 In light of the foregoing discussion of the ALJ's analysis of

21 Plaintiff's credibility, the Court concludes that, on remand, the ALJ

22 must reassess Plaintiff's residual functional capacity at step four,

23 and revisit his step-five finding that Plaintiff can perform other

24 work.

25    A claimant's residual functional capacity reflects what she can

26 still do despite her physical, mental, nonexertional, and other

27 limitations.  *See* 20 C.F.R. § 404.1545.  The Agency examines a

28 claimant's "residual functional capacity and the physical and mental

demands" of her past relevant work at step four of the sequential process.  *See* 20 C.F.R. § 404.1520(e); *see also Pinto v. Massanari*, 249 F.3d 840, 844-45 (9th Cir. 2001).  This assessment entails a "function-by-function" analysis of a claimant's capacity to work according to exertional categories.  The residual functional capacity must include the individual's functional limitations or restrictions and assess her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945.  In determining a claimant's residual functional capacity, the ALJ must consider the limiting effects of all of her impairments, even those that were not severe.  20 C.F.R. § 404.1545(e); *see also* SSR 96-8p at 5.  Only after that may the ALJ express the claimant's residual functional capacity in terms of exertional levels of work: sedentary, light, medium, heavy, and very heavy.  *See* SSR 96-8p.  Although a claimant's residual functional capacity is assessed at step four, the ALJ must make the requisite factual findings to support his assessment.  *See* SSR 82-62.

It bears emphasis that an ALJ's "[h]ypothetical questions posed to the vocational expert must set out *all* the limitations and restrictions of the particular claimant . . . ."  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)(emphasis in original); *see also Thomas*, 278 F.3d at 956 (cautioning that, "[i]n order for the testimony of a vocational expert to be considered reliable, the hypothetical posed must include all of the claimant's functional limitations, both physical and mental[,] supported by the record")(citation and internal quotation marks omitted).  If the hypothetical question that the ALJ poses to the vocational expert "does not reflect all the claimant's limitations, . . . [then] the expert's testimony has no evidentiary

25

value to support a finding that the claimant can perform jobs in the national economy." *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1990).

In his decision, the ALJ concluded that Plaintiff could do sedentary assembly work. (*See* AR 31.)   The ALJ's specific assessment of Plaintiff's residual functional capacity was as follows:

> [Plaintiff] can lift up to ten pounds at a time and she can occasionally lift and carry articles like docket files, ledgers, and small tools.  [Plaintiff] can stand/and or walk approximately two hours in an eight-hour workday and sit approximately six hours in an eight-hour workday.
> [Plaintiff] would also need to avoid pulmonary irritants, such as fumes, odors, dusts, gases, poor ventilation, etc.

(*See* AR 28.)

Plaintiff faults the ALJ for "fail[ing] to discuss any of [her] testimony [. . .] regarding her use of a breathing nebulizer machine at her home for minor exacerbations which occur on a frequent basis." (*See* Motion at 9.)   Indeed, nowhere in the ALJ's residual functional capacity assessment is there any mention of the uncontroverted evidence that Plaintiff requires twice-weekly use of her home nebulizer machine to forestall asthma attacks.  (*Compare* AR 28 *with* AR 522.)   The Court concludes that this omission will require further proceedings on remand.   As noted previously, an asthmatic claimant's need to use a nebulizer machine outside of a hospital setting is a potentially-significant limitation that may reduce the number of jobs available to her.   *Compare Mullins*, 2005 WL 1606459, at *12 (recounting vocational expert testimony to the effect that an asthmatic claimant "who had to use a nebulizer at work generally could

1  not perform any jobs") *with Carroll*, 291 F.Supp.2d at 796 (affirming
2  the ALJ's finding of non-disability where the vocational expert
3  testified that the claimant's limitations, including her need for
4  nebulizer treatments, would not preclude employment).  As the above-
5  cited conflict in the district court authorities suggests, however,
6  the impact a claimant's nebulizer usage will have on her employability
7  turns on factual circumstances best left to a vocational expert.

8       Where the ALJ omits a claimant's home nebulizer usage from his
9  hypothetical question to the vocational expert, remand is appropriate.
10 *See Eback v. Chater*, 94 F.3d 410, 411-12 (8th Cir. 1996)(reversing an
11 ALJ's step-five finding of non-disability where the ALJ assumed that
12 an asthmatic claimant could use her nebulizer during breaks without
13 including this assumption in his hypothetical question to the
14 vocational expert); *see also Smith*, 2005 WL 589758, at *9 (remanding
15 for further proceedings where the ALJ failed to include several of an
16 asthmatic claimant's physical limitations in her hypothetical
17 questions to the vocational expert, including her need for a home
18 nebulizer); *Wilson*, 2004 WL 1687086, at *4 (remanding where the ALJ
19 did not include the claimant's "stated need for multiple daily
20 nebulizer treatments" in his hypothetical question to the vocational
21 expert); *Neely v. Apfel*, No. 99 C 4132, 2000 WL 1285427, at *6 (N.D.
22 Ill. Sept. 11, 2000)(remanding for further proceedings where the ALJ's
23 finding that an asthmatic claimant "would be able to administer the
24 [nebulizer] treatments in a manner that would not interfere with her
25 performance of work-related activities" was made without the benefit
26 of the testimony of a vocational expert and had "no support in the
27 record").  In Plaintiff's case, however, the situation is not clear-
28 cut.  As explained above, Plaintiff attested to the various

limitations her asthma causes, including her need to use a nebulizer
at home.  (*See* AR 522.)   One of the ALJ's hypothetical questions
instructed the vocational expert to assume that all of Plaintiff's
claimed limitations were found "fully believable," (*see* AR 537-38),
and the ALJ later stated that this assumption included, among many
other things, Plaintiff's claimed nebulizer use.  (AR 545.)

A more searching review of the record convinces the Court,
however, that the vocational expert was confused as to what a
"nebulizer" is.  Counsel appears to have described the apparatus as
"something that is plugged into the wall and that [Plaintiff] then has
to administer," and added that a nebulizer "take[s] longer than [the]
seconds that it takes to use an inhaler."  (*See* AR 544-45.)   After
several interruptions by the ALJ, (*see* AR 542, 545-51), the vocational
expert opined that Plaintiff would require "[e]xtra breaks when using
the nebulizer and *I'm not sure how long that takes,* other than I know
it's leaving the worksite."  (AR 551-52 (emphasis added).)   As the
emphasized portion suggests, the vocational expert testified that she
was speculating regarding Plaintiff's nebulizer usage.   This was the
ALJ's cue to clarify the hypothetical question, elicit additional
testimony from Plaintiff, or both: yet he did neither.   In these
circumstances, reversal for further proceedings is proper.   *See*
*DeLorme*, 924 F.2d at 850 (remanding "when the vocational expert
described confusion over" the content of a hypothetical question and
"the ALJ did not clarify the hypothetical"); *see also Burnett v.*
*Barnhart*, No. 02-C-8462, 2004 WL 1093271, at *10 (N.D. Ill. May 6,
2004)(remanding where the ALJ's decision was based in part on "the
testimony of a confused medical expert").   And to the extent that the
vocational expert assumed that using such a device necessarily would

involve "leaving the worksite," she injected an assumption into the hypothetical question that was not supported by the evidence.  *See Magallanes*, 881 F.2d at 756 (holding that a vocational expert's testimony on a claimant's residual functional capacity "has no evidentiary value if the assumptions in the hypothetical are not supported by the record").

On remand, the ALJ's hypothetical questions to the vocational expert must reflect *all* of Plaintiff's claimed limitations for which there is substantial evidence in the record.  As the record now stands, there is--in addition to the other limitations the ALJ included in his hypothetical questions to the vocational expert-- substantial evidence that Plaintiff required bi-weekly usage of a home nebulizer machine.  (*See* AR 522.)  The ALJ must include this limitation in a hypothetical question to the vocational expert; changes in the frequency of Plaintiff's nebulizer usage since the last hearing, if any, should be reflected in separate hypothetical questions.  To the extent that the vocational expert requires clarification on the nature of a nebulizer--including how it works, how long it takes to use one, and how portable it is--additional clarification from Plaintiff or even a medical expert may prove helpful.

D.   <u>Remand Is Appropriate</u>

The determination whether to remand for further proceedings or for payment of benefits lies within the discretion of the Court. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  In most circumstances in Social Security disability cases, remand is appropriate.  *See Moisa v. Barnhart*, 367 F.3d 882, 886-87 (9th Cir. 2004).  Remand may be productive where additional proceedings can

1   remedy defects in the original administrative proceedings.  *See*

2   *Celaya v. Halter*, 332 F.3d 1177, 1184 (9th Cir. 2003).

3        In this case, as explained above, the vagueness of the

4   hypothetical questions that the ALJ posed to the vocational expert--

5   along with the confusion caused when the ALJ interrupted counsel

6   during his examination of this witness--make it unclear what impact,

7   if any, the use of a home nebulizer would have on her ability to

8   perform other work.  Nor did the ALJ explain whether he rejected this

9   particular limitation in the course of his otherwise-detailed

10  credibility findings.

11       Remand is, therefore, necessary to enable the ALJ to retrace

12  these steps in the sequential process.  As the foregoing indicates,

13  the ALJ must update the record, retain the services of another

14  vocational expert, and conduct another hearing for the purpose of

15  determining whether Plaintiff can perform other jobs existing in

16  significant numbers in the local economy.  At that hearing, the ALJ

17  must pose hypothetical questions that include *all* of Plaintiff's

18  limitations for which there is substantial evidence; at a minimum,

19  such questions must include a characteristic that would account for

20  Plaintiff's use of a home nebulizer machine.  To whatever extent the

21  vocational expert requires clarification of any of Plaintiff's

22  limitations, including her use of a nebulizer, the ALJ must develop

23  the record to provide the expert with sufficient information.

24       After the hearing, the ALJ must issue a new decision.  As

25  explained above, the ALJ should correct his erroneous step-three

26  characterization of the requirements of Listing 3.03B.  The ALJ also

27  must reassess Plaintiff's credibility, offering clear and convincing

28  reasons for rejecting her testimony about her subjective symptoms and

1  limitations--including her claimed use of a nebulizer at home--

2  specifically connecting such testimony with the particular evidence

3  that contradicts it.   In light of those new credibility findings, the

4  ALJ must then reassess Plaintiff's residual functional capacity at

5  step four of the sequential process, and redetermine whether she can

6  perform other jobs at step five.

7                                    IV.

8                                 CONCLUSION

9          For the reasons set forth above, this Court finds that the

10  Agency's findings were not supported by substantial evidence and were

11  not free from material legal error.   Accordingly, the Court REVERSES

12  the decision of the Agency and REMANDS for further proceedings.

13

14          IT IS SO ORDERED.

15          DATED:      August   __1__ , 2005.

16

17                                              /s/
                                       _____

18                                     PATRICK J. WALSH
                                       UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28  S:\PJW\Cases-Soc Sec\VASQUEZ, L 537\Memo Opinion_Ord.wpd